**LIBERTY ALLIANCE OF THE BLIND, Lillian Carney, John Coleman, Oliver Ewell, Emma Jenkins, Lillian Luksa, Ernestine Lyons, Dennie McNeil, Maude and Benjamin Pratt and Caterine Sullivan, on behalf of themselves and all others similarly situated, Appellants in No. 77–1010,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Appellant in No. 77–1011,**

**and**

**Frank S. Beal, Secretary of the Pennsylvania Department of Public Welfare.**

**Nos. 77–1010 and 77–1011.**

United States Court of Appeals, Third Circuit.

Argued Oct. 4, 1977.

Decided Dec. 6, 1977.

Linda M. Bernstein, Community Legal Services, Inc., Philadelphia, Pa., for appellants in 77–1010 and as cross-appellees in 77–1011.

Barbara L. Babcock, Acting Asst. Atty. Gen., David W. Marston, U. S. Atty., Randolph W. Gaines, Chief of Litigation, Washington, D. C., Linda L. Cromwell, Dept. of Health, Ed. and Welfare, Baltimore, Md., for appellee in 77–1010 and as cross-appellant in 77–1011.

Before GIBBONS and WEIS, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Plaintiffs, ten blind Pennsylvania recipients of Supplemental Security Income benefits and Liberty Alliance of the Blind (Liberty Alliance), an organization of blind persons dedicated to improving the economic and social status of the blind, appeal from a final decision of the District Court dismissing their case against the Secretary of Health, Education and Welfare and denying class action certification. The Secretary cross-appeals from a final order of the District Court granting summary judgment in favor of one blind plaintiff, Lillian Carney.

At issue in both appeals is the proper interpretation of § 1611(h) of the Social Security Act Amendments of 1972, Pub.L. No. 92–603, tit. III, § 301, which provides that, in determining the amount of Supplemental Security Income benefits for blind persons, there shall be disregarded the greater of either the amount that could have been disregarded under the former state plan or the amount which would be

---

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

disregarded under the relevant provisions of the Supplemental Security Income program. The District Court agreed with the plaintiffs that in addition to those forms of income specifically directed to be disregarded under the prior Pennsylvania plan, § 1611(h) mandates that the Secretary disregard income which, because of the state plan's assessment of basic, special, and spousal needs, would have been excluded from the computation of benefits under the state plan. However, the District Court declined to order that this interpretation be applied to all Pennsylvania blind recipients of Supplemental Security Income benefits because, except for Carney, the plaintiffs had not, when the suit was filed, exhausted administrative remedies. Liberty Alliance contends that, although the precise computation of benefits would vary among the individual claimants, the legal issue of the interpretation of § 1611(h) is common to all blind claimants in Pennsylvania and, thus, the Court should have afforded class action relief in order to obviate the necessity for multiple administrative and judicial proceedings litigating the identical issue. The Secretary urges, first, that the District Court misconstrued § 1611(h) in Carney's case and, second, that even if the Court's construction is accepted, that ruling cannot benefit any other claimant because the rule requiring exhaustion of administrative remedies bars class relief even as to a question of law. We affirm the District Court's interpretation of § 1611(h), but reverse its decision that the failure of each individual claimant to exhaust administrative remedies barred class relief. Therefore, we remand the case to the District Court for a determination of the appropriateness of permitting the case to proceed as a class action.

## I. THE SECRETARY'S APPEAL IN LILLIAN CARNEY'S CASE

Under Title X of the Social Security Act of 1935 [1] the Federal Government assumed responsibility for helping the states to provide public assistance payments to the needy blind by providing matching funds for approved assistance plans. The Act required the states, in determining the need for assistance, to consider the income and resources of the claimants. Because some states, including Pennsylvania, rendered assistance to blind persons who already had some minimum income and resources, these states did not initially qualify for federal matching funds. In a major revision of the Act, the Social Security Act Amendments of 1950,[2] Congress addressed that issue. Senate Report No. 1669 [3] on the bill which became the 1950 Amendments Act states:

Under title X of the Social Security Act the States are required, in determining the need for assistance, to take into consideration the income and resources of claimants of aid to the blind. Your committee believes this requirement stifles incentive and discourages the needy blind from becoming self-supporting and that therefore it should be replaced by a requirement that would assist blind individuals in becoming useful and productive members of their communities. Accordingly, the committee-approved bill would require all States administering federally approved aid to the blind programs to disregard earned income up to $50 per month of claimants of aid to the blind beginning July 1, 1952. The exemption of earnings would be discretionary with each State prior to that date so the State legislatures will be afforded an opportunity to make any necessary changes in their aid to the blind laws to conform to the new requirement.

Aid to the needy blind, in the judgment of your committee, is not in the same category with assistance programs for other needy individuals. Opportunities for gainful employment for blind individuals are limited and their necessary ex-

---

1. Pub.L. No. 74–271, ch. 531, tit. X, 49 Stat. 645 (Aug. 14, 1935).

2. Pub.L. No. 81–734, ch. 809, §§ 341 and 344, 64 Stat. 553–54.

3. S.Rep.No.1669, 81st Cong., 2d Sess., *reprinted in* [1950] United States Code Cong.Serv. pp. 3287, 3345–46 (May 17, 1950).

penditures are increased by the need for special books, for special medical treatment in some cases, and for guide service and readers. As with concessions and special provisions for the blind in other laws, the exemption of earnings up to $50 per month is not regarded by your committee as a precedent for similar treatment for individuals who are not blind.

In recognition of blind persons' special needs, the 1950 Amendments Act embodied the policy of treating them differently from other public assistance beneficiaries. The Act qualified the standard requirement "that the State agency shall, in determining need, take into consideration any other income and resources of the individual claiming aid" with the proviso "except that, in making such determination, the State agency shall disregard the first $50 per month of earned income."[4] Thus the concept of disregarding income and resources of blind persons, which did not appear in other public assistance programs, was introduced into the Social Security Act. The formula for such disregards was changed over the years. Its last version appears in 42 U.S.C. § 1202(a)(8).[5]

> (a) A state plan for aid to the blind must . . . (8) provide that the State Agency shall, in determining need, take into consideration any other income and resources of the individual claiming aid to the blind, as well as any expenses reasonably attributable to the earning of any such income, except that, in making such determination, the State Agency (A) shall disregard the first $85 per month of earned income, plus one-half of earned income in excess of $85 per month, (B) shall, for a period not in excess of twelve months, and may, for a period not in excess of thirty-six months, disregard such additional amounts of other income and resources, in the case of an individual who has a plan for achieving self-support approved by the State Agency, as may be necessary for the fulfillment of such plan,

and (C) may, before disregarding the amounts referred to in clauses (A) and (B), disregard not more than $7.50 of any income . . . .

As this statutory subsection indicates, in the years 1972–1974 the Title X public assistance program for blind persons recognized both mandatory and optional disregards of income and resources.

When, in 1950, Congress was considering the concept of special disregards of income and resources of publicly assisted blind persons, Pennsylvania was not a participant in the Title X program. Senate Report No. 1669 discusses the Pennsylvania problem:

> Pennsylvania has been negotiating for some time with the Social Security Administration to arrive at a basis by which it could develop a plan for aid to the blind that could be approved as conforming to the requirements of the Social Security Act. To help in solving the issue which has stood in the way of accepting the plan proposed by Pennsylvania and to facilitate formulation of acceptable plans by other States that do not at the present time have approved plans, the bill would amend title X. The bill would provide that, for an interim period, the Federal Security Administrator shall approve a plan of such State for aid to the blind, even though it does not meet the requirement in title X of the act, as amended, relating to the determination of need and consideration of resources, if the plan meets all other requirements. The amendment would provide, however, that Federal participation shall be available only with respect to expenditures which would be approvable under the requirements of title X, clause (8), section 1002(a) of the act, as amended by the bill. This amendment would be effective only for the period October 1, 1950, to June 30, 1953. Your committee believes that this period of time will enable the States concerned to amend their laws and develop

---

4. Pub.L. No. 81–734, ch. 809, § 341(c)(2), 64 Stat. 553 (effective July 1, 1952).

5. Repealed effective January 1, 1974, except with respect to Puerto Rico, Guam, and the Virgin Islands, by Pub.L. No. 92–603, tit. III, § 303(a)(b), 86 Stat. 1484 (Oct. 30, 1972).

aid-to-blind plans that conform in all respects with the requirements of title X.

The source of Pennsylvania's problem apparently was that its plan was more generous in disregarding income and resources of blind persons than was the Federal Government's. Section 344(a) of Pub.L. No. 81–734, ch. 809, 64 Stat. 554, provided for Pennsylvania's program and for states with similar plans:

> In the case of any State . . . which did not have on January 1, 1949, a State plan for aid to the blind approved under title X of the Social Security Act, the Administrator shall approve a plan of such State for aid to the blind for the purposes of such title X, even though it does not meet the requirements of clause (8) of section 1002(a) of the Social Security Act, if it meets all other requirements of such title X for an approved plan for aid to the blind; but payments under section 1003 of the Social Security Act shall be made, in the case of any such plan, only with respect to expenditures thereunder which would be included as expenditures for the purposes of such section under a plan approved under such title X without regard to the provisions of this Section.

This provision of § 344 is codified in the last sentence of 42 U.S.C. § 1202. The authority to approve a plan not in conformity with clause (8) of 42 U.S.C. § 1202(a) was limited by § 344(b) to a period of five years. However, this limitation was not included in the codified version, 42 U.S.C. § 1202(a) & (b).

The record before us does not disclose when Pennsylvania's plan for public assistance to the blind was approved, whether that plan was approved as conforming to clause (8), or whether it was approved pursuant to the special exception to clause (8) present in § 344(b). But it is undisputed that Pennsylvania had, in 1972 and 1973, an approved plan, the terms of which are set forth in the Pennsylvania Department of Welfare, Office of Income Maintenance, Public Assistance Manual §§ 3410–3420.

In 1972 Congress enacted a major revision of the Social Security Act. Germane to blind persons was the congressional decision to repeal Title X of the 1935 Social Security Act and to substitute for federal matching grants to the states a new program which would be administered and funded federally. The bill, which became the Social Security Amendments of 1972,[6] was H.R. 1 in the second session of the Ninety-second Congress, Title III of which dealt with the new federal program for the aged, blind, and disabled. H.R. 1 set forth federal standards, including income and resource limitations, for the determination of benefits. These proposed federal income and resource standards were not identical either with the disregard provisions of 42 U.S.C. § 1202(a)(8) or with the provisions of Pennsylvania's approved plan. H.R. 1 was eventually enacted, with the new Supplemental Security Income benefits replacing the former federal-state assistance program, effective January 1, 1974. As enacted, however, Pub.L. No. 92–603 contained two provisions (among others not relevant here) which did not appear in the original bill. These provisions were subsections (g) and (h) of § 1611, the section of the new title dealing with the eligibility of blind persons for benefits:

Certain Individuals Deemed to Meet
Resources Test

(g) In the case of any individual or any individual and his spouse (as the case may be) who for the month of December 1973 was a recipient of aid or assistance under a State plan approved under title I, X, XIV, or XVI, the resources of such individual or such individual and his spouse shall be deemed not to exceed the amount specified in sections 1611(a)(1)(B) and 1611(a)(2)(B) during any period that the resources of such individual or individual and his spouse (as the case may be) does not exceed the maximum amount of resources, as specified in the State plan (above referred to, and as in effect in October 1972) under which he or they

6. Pub.L. No. 92–603, 86 Stat. 1329.

were entitled to aid or assistance for the month of December 1972.

### Certain Individuals Deemed to Meet Income Test

(h) In determining eligibility for, and the amount of, benefits payable under this section in the case of any individual or any individual and his spouse (as the case may be) who is blind (as that term is defined under a State plan approved under title X or XVI as in effect in October 1972) and who for the month of December 1973 was a recipient of aid or assistance under a State plan approved under title X or XVI, there shall be disregarded an amount equal to the greater of the amounts determined as follows—

(1) the maximum amount of any earned or unearned income which could have been disregarded under the State plan (above referred to, and as in effect in October 1972), or

(2) the amount which would be required to be disregarded under section 1612 without application of this subsection.

42 U.S.C. §§ 1382(g) & (h).

These so-called grandfather clauses, particularly subsection (h), produced the instant lawsuit. Mrs. Carney contends that while the overall intention of the 1972 Amendments may have been to substitute a uniform federal Supplemental Security Income program for the former state public assistance programs, in which net benefits varied from state to state, the purpose of the grandfather clauses was to prevent any diminution in net benefits in those states whose programs were more generous than the new federal program. The Secretary contends that this is only partly true. He concedes that § 1611(g), the grandfather clause dealing with the disregard of re-

sources, cross-references to the state plan under which the claimant was receiving benefits prior to the effective date of the new program. But he urges that the *income* disregards grandfather clause of § 1611(h) does not cross-reference to those Pennsylvania plan provisions which, because of spousal and other special needs, did not include certain amounts of income in the claimant's need determination, but rather to other provisions which only disregarded specific types, and very small amounts, of income. The Secretary reasons that the variance in wording between the two subsections of § 1611 suggests that Congress intended a single federal income definition.[7] In effect, the Secretary argues that Congress intended a uniform federal standard for income disregards. He refers us to no legislative history which bolsters that interpretation, however, and neither counsel has even traced the origins of the amendments to H.R. 1 which resulted in the two statutory subsections.

Our research discloses that the Senate Finance Committee would initially have continued state administration of public assistance to the aged, blind, and disabled, with federal standards for income disregards, but with the states remaining free to be more generous in certain respects.[8] The Senate eventually agreed to the House of Representatives version transferring the program to the Social Security Administration. The grandfather clause respecting the disregard of resources originated in the Senate as a floor amendment by Senator Cranston.[9] We have been unable to determine when or how the income disregards grandfather clause made its way into the bill. We do know, however, that that clause was in the bill by October 17, 1972, for the Summary of Social Security Amendments of 1972 as approved by the Conferees contains the following language:

7. *See* Appellee's Brief at p. 13.

8. Senate Finance Committee, Social Security and Welfare Reform, Summary of the Principal Provisions of H.R. 1 as Determined by the Committee on Finance, at 54–55 (June 13, 1972), *printed in* 92d Cong., 2d Sess., Senate Finance Committee Prints.

9. H.R. 1, *Social Security Amendments of 1972, Brief Description of Senate Amendments,* Prepared for the Use of the Conferees, at 38–39 (Oct. 11, 1972), *printed in* 92d Cong., 2d Sess., Senate Finance Committee Prints.

*Earned Income Disregard*

In addition to a monthly disregard of $20 of social security or other income, there would be an additional disregard of $65 of earned income plus one-half of any earnings above $65. This will enable those aged, blind, and disabled individuals who are able to do some work to do so and in the process given them a higher income in addition to supplemental security income.

In addition, as under present law, any income necessary for the fulfillment of a plan for achieving self-support would be disregarded for persons qualifying on the basis of blindness. *A savings clause would assure that blind persons would not receive any reduction in benefits due to those provisions.*[10]

(Emphasis supplied.)

If, as stated above, the purpose of the savings clause was to assure that blind persons would not "receive any reductions in benefits," it would seem that the Secretary's construction of § 1611(h) is incorrect, for under that construction some blind persons could suffer reductions in benefits. Moreover, despite the slight variation in wording between § 1611(g) and § 1611(h), they both are patently aimed at the same problem—a state plan which was more generous in disregarding resources and income

than the succeeding federal plan. We think that taken together subsections (g) and (h) must be read as cross-references to the state plan's complete provisions for disregarding resources and income as they actually operated through December 31, 1973.

Complicating the picture further, however, is an uncodified statute, Title II of Pub.L. No. 93–66, which became law on July 9, 1973, prior to the effective date of the provisions of the 1972 amendments relating to the blind. Title I of Pub.L. No. 93–66 is a one sentence extender of the Renegotiation Act of 1951, which has nothing to do with the Social Security Act. Title II contains provisions relating to the Social Security Act, including amendments to § 1611(a) and (b), the federal income disregards provisions. The statute amends § 1611(g) in a manner not here relevant, but does not deal with § 1611(h). The Secretary contends, however, that § 212 of Pub.L. No. 93–66 operates as an additional grandfather clause which must be read in pari materia with § 1611(g). That statute appears to condition a state's eligibility for federal assistance in some programs on the state's implementation of a supplementary payments plan. Section 212 of Pub.L. No. 93–66 is a model of obscurity.[11] The Secretary says:

10. Senate Finance Committee and House Committee on Ways and Means, Summary of Social Security Amendments of 1972 as Approved by the Conferees (Joint Publication), at 27 (Oct. 17, 1972), *printed in* 92d Cong., 2d Sess., Senate Finance Committee Prints.

11. Sec. 212(a)(1). In order for any State (other than the Commonwealth of Puerto Rico, Guam, or the Virgin Islands) to be eligible for payments pursuant to title XIX, with respect to expenditures for any quarter beginning after December 1973, such State must have in effect an agreement with the Secretary of Health, Education, and Welfare (hereinafter in this section referred to as the "Secretary") whereby the State will provide to individuals residing in the State supplementary payments as required under paragraph (2).

(2) Any agreement entered into by a State pursuant to paragraph (1) shall provide that each individual who—

(A) is an aged, blind, or disabled individual (within the meaning of section 1614(a) of the Social Security Act, as enacted by section

301 of the Social Security Amendments of 1972), and

(B) for the month of December 1973 was a recipient of (and was eligible to receive) aid or assistance (in the form of money payments) under a State plan of such State (approved under title I, X, XIV, or XVI of the Social Security Act)

shall be entitled to receive from the State the supplementary payments described in paragraph (3) for each month beginning with January 1974 and ending with whichever of the following first occurs:

(C) the month in which such individual dies, or

(D) the first month in which such individual ceases to meet the condition specified in subparagraph (A);

except that no individual shall be entitled to receive such supplementary payment for any month, if, for such month, such individual was ineligible to receive supplemental income benefits under title XVI of the Social Security Act by reason of the provisions of section

1611(e)(1)(A), (2), or (3), 1611(f), or 1615(c) of such Act.

(3)(A) The supplementary payment referred to in paragraph (2) which shall be paid for any month to any individual who is entitled thereto under an agreement entered into pursuant to this subsection shall (except as provided in subparagraphs (D) and (E)) be an amount equal to (i) the amount by which such individual's "December 1973 income" (as determined under subparagraph (B)) exceeds the amount of such individual's "title XVI benefit plus other income" (as determined under subparagraph (C)) for such month, or (ii) if greater, such amount as the State may specify.

(B) For purposes of subparagraph (A), an individual's "December 1973 income" means an amount equal to the aggregate of—

(i) the amount of the aid or assistance (in the form of money payments) which such individual would have received (including any part of such amount which is attributable to meeting the needs of any other person whose presence in such individual's home is essential to such individual's well-being) for the month of December 1973 under a plan (approved under title I, X, XIV, or XVI of the Social Security Act) of the State entering into an agreement under this subsection, if the terms and conditions of such plan (relating to eligibility for and amount of such aid or assistance payable thereunder) were, for the month of December 1973, the same as those in effect, under such plan, for the month of June 1973, together with the bonus value of food stamps for January 1972, as defined in section 401(b)(3) of Public Law 92–603, if, for such month, such individual resides in a State which provides State supplementary payments (I) of the type described in section 1616(a) of the Social Security Act, and (II) the level of which has been found by the Secretary pursuant to section 8 of Public Law 93–233 to have been specifically increased so as to include the bonus value of food stamps, and

(ii) the amount of the income of such individual (other than the aid or assistance described in clause (i)) received by such individual in December 1973, minus any such income which did not result, but which if properly reported would have resulted in a reduction in the amount of such aid or assistance.

(C) For purposes of subparagraph (A), the amount of an individual's "title XVI benefit plus other income" for any month means an amount equal to the aggregate of—

(i) the amount (if any) of the supplemental security income benefit to which such individual is entitled for such month under title XVI of the Social Security Act, and

(ii) the amount of any income of such individual for such month (other than income in the form of a benefit described in clause (i)).

(D) If the amount determined under subparagraph (B)(i) includes, in the case of any individual, an amount which was payable to such individual solely because of—

(i) a special need of such individual (including any special allowance for housing, or the rental value of housing furnished in kind to such individual in lieu of a rental allowance) which existed in December 1973, or

(ii) any special circumstance (such as the recognition of the needs of a person whose presence in such individual's home, in December 1973, was essential to such individual's well being).

and, if for any month after December 1973 there is a change with respect to such special need or circumstance which, if such change had existed in December 1973, the amount described in subparagraph (B)(i) with respect to such individual would have been reduced on account of such change, then, for such month and for each month thereafter the amount of the supplementary payment payable under the agreement entered into under this subsection to such individual shall (unless the State, at its option, otherwise specifies) be reduced by an amount equal to the amount by which the amount (described in subparagraph (B)(i)) would have been so reduced.

(E)(i) In the case of an individual who, for December 1973 lived as a member of a family unit other members of which received aid (in the form of money payments) under a State plan of a State approved under part A of title IV of the Social Security Act, such State at its option, may (subject to clause (ii)) reduce such individual's December 1973 income (as determined under subparagraph (B)) to such extent as may be necessary to cause the supplementary payment (referred to in paragraph (2)) payable to such individual for January 1974 or any month thereafter to be reduced to a level designed to assure that the total income of such individual (and of the members of such family unit) for any month after December 1973 does not exceed the total income of such individual (and of the members of such family unit) for December 1973.

(ii) The amount of the reduction (under clause (i)) of any individual's December 1973 income shall not be in an amount which would cause the supplementary payment (referred to in paragraph (2)) payable to such individual to be reduced below the amount of such supplementary payment which would be payable to such individual if he had, for the month of December 1973 not lived in a family, members of which were receiving aid under part A of title IV of the Social Security Act, and had had no income for such month other than that received as aid or assistance under a State plan approved under title I, X, XIV, or XVI of the Social Security Act.

(b)(1) Any state having an agreement with the Secretary under subsection (a) may enter into an administration agreement with the Sec-

This statute provides for mandatory state payments in supplement to the Federal SSI payments to the extent that a recipient's SSI benefit plus other current income is less than his state grant amount plus other income as of December 1973. Appellee's Brief, at 4. He would have us read § 212 and § 1611(h) together to mean that the federal standard for income disregards applies, but that where a former state plan used different terminology, such as "special needs," in determining the level of benefits, the state, not the federal government, would be obliged to continue such payments.[12] The record does not disclose whether Pennsylvania has in effect an agreement with the Secretary pursuant to § 212, but the briefs seem to assume so.

Mrs. Carney interprets § 212 as establishing a separate "minimum income level" floor on benefits for grandfathered Supplemental Security Income recipients. She contends that this statute has nothing to do with the question which §§ 1611(g) and (h) addressed-namely, whether a blind person would continue to receive the equivalent total package of benefits, including potential disregards of income and resources which were available under the state plan. She urges that the language in § 1611(h)(1) "which could have been disregarded under the State plan (above referred to, and as in effect in October 1972)" must be read as a reference to the entire income calculating mechanism of the state plans. The District Court accepted this interpretation, albeit without addressing the possible effect of § 212 of Pub.L. No. 93–66. In Mrs. Carney's case this led to a result at variance with the decision of the administrative agency, because under the Pennsylvania plan more of her spouse's income was disregarded in calculating her benefits than under the federal statute and regulations. The Social Security hearing examiner had held, and the appeals council had agreed,

retary whereby the Secretary will, on behalf of such State, make the supplementary payments required under the agreement entered into under subsection (a).

(2) Any such administration agreement between the Secretary and a State entered into under this subsection shall provide that the State will (A) certify to the Secretary the names of each individual who, for December 1973, was a recipient of aid or assistance (in the form of money payments) under a plan of such State approved under title I, X, XIV, or XVI of the Social Security Act, together with the amount of such assistance payable to each such individual and the amount of such individual's December 1973 income (as defined in subsection (a)(3)(B)), and (B) provide the Secretary with such additional data at such times as the Secretary may reasonably require in order properly, economically, and efficiently to carry out such administration agreement.

(3) Any state which has entered into an administration agreement under this subsection shall, at such times and in such installments as may be agreed upon between the Secretary and the State, pay to the Secretary an amount equal to the expenditures made by the Secretary as supplementary payments to individuals entitled thereto under the agreement entered into with such State under subsection (a).

(c)(1) Supplementary payments made pursuant to an agreement entered into under subsection (a) shall be excluded under section 1612(b)(6) of the Social Security Act (as in effect after December 1973) in determining in-

come of individuals for purposes of title XVI of such Act (as so in effect).

(2) Supplementary payments made by the Secretary (pursuant to an administration agreement entered into under subsection (b)) shall, for purposes of section 401 of the Social Security Amendments of 1972 be considered to be payments made under an agreement entered into under section 1616 of the Social Security Act (as enacted by section 301 of the Social Security Amendments of 1972; except that nothing in this paragraph shall be construed to waive, with respect to the payments so made by the Secretary, the provisions of subsection (b) of such section 401.

(d) For purposes of subsection (a)(1), a State shall be deemed to have entered into an agreement under subsection (a) of this section if such State has entered into an agreement with the Secretary under section 1616 of the Social Security Act under which—

(1) individuals, other than individuals described in subsection (a)(2)(A) and (B), are entitled to receive supplementary payments, and

(2) supplementary benefits are payable, to individuals described in subsection (a)(2)(A) and (B) at a level and under terms and conditions which meet the minimum requirements specified in subsection (a).

12. The Secretary does not claim that the intent of Pub.L. No. 93–66 was to carry forward the limitations on federal payments contained in Pub.L. No. 83–734, ch. 809, § 344(a), 64 Stat. 553–54.

that the Pennsylvania provisions for disregarding spousal income did not apply to Mrs. Carney. The agency did not address the applicability of Pub.L. No. 93–66.

▮▮▮ Not without doubt, and with discomfort over the level of assistance we have received from the parties with respect to the legislative history of these ambiguous statutes, we conclude, as did the District Court, that Mrs. Carney's construction of § 1611(h) is the more likely congressional intention. We reach this conclusion for several reasons. We note, first, that the Secretary conceded that § 1611(g) adopted a non-uniform standard for grandfathered resource disregards. Nothing in the language of § 1611(h) suggests an intention to depart from that policy decision favoring non-uniformity with respect to income disregards. Secondly, since 1950 federal policy has tolerated departures from uniformity with respect to income disregards, at least for Pennsylvania blind recipients of public assistance. Moreover, because Pub.L. No. 93–66 does not, in so many words, amend § 1611(h), we think that Pub.L. No. 93–66 should be read, as Mrs. Carney suggests, to create a separate guaranteed minimum income level. As a matter of statutory interpretation, repeals by implication are usually not recognized. *See Silver v. New York Stock Exch.*, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), *quoting United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

We recognize the force of the Secretary's argument that Mrs. Carney's interpretation grandfathers the entire Pennsylvania state plan with respect to earned, unearned, or spousal income disregards and that the result may be a calculation of assistance payments more favorable to blind recipients with significant amounts of such income than to recipients with little or no outside support. But the policy judgment that blind persons should be treated differently in order to encourage them to be more

self-sufficient was made in 1950. In addition, the disparity in treatment between blind persons with income and those without it was a feature of the Pennsylvania plan in effect in 1972. If, as the Secretary urges, it was Congress' intent to provide for a uniform needs level and to eliminate the vagaries of individual state plans, Congress would not have enacted § 1611(g) or (h). Apparently blind persons receiving benefits under the former program had an effective advocate in Congress who succeeded in excepting them from the general rule of uniformity.

This interpretation of § 1611(h) leads us to affirm the order of the District Court remanding Mrs. Carney's case to the Secretary for a redetermination of the benefits due her.

## II. THE APPEAL OF LIBERTY ALLIANCE AND THE OTHER CLAIMANTS

The District Court dismissed the complaint of the remaining nine individuals for lack of jurisdiction on the ground that they had not exhausted administrative remedies and the complaint of Liberty Alliance for lack of standing. The Court denied class action certification because it concluded that there would be no jurisdiction over the members of the alleged class since they had not exhausted administrative remedies, although each member of the class had filed a claim with the Secretary. The effect of the ruling is an interpretation of 42 U.S.C. § 405(g) which precludes the court from requiring the Secretary to apply the legal ruling on § 1611(h) in favor of claimants whose claims present the identical legal issue. The potential for the multiplication of administrative and judicial review proceedings, and thus for the waste of administrative and judicial resources, is obvious. That prospect suggests that we should give rather strict scrutiny to a statute which, it is claimed, mandates such a result.[13]

---

**13.** The difficulties resulting from multiplication of hearing requirements in welfare benefits cases are discussed in Friendly, *"Some Kind of Hearing,"* 123 U.Pa.L.Rev. 1267 (1975), and in

Van Dusen, *Some Brief Observations on Expediting Agency Hearings and Preserving an Adequate Record,* 7 Rut.Cam.L.Rev. 419 (1976).

In *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the Supreme Court held that 42 U.S.C. § 405(g) provides the sole means for obtaining judicial review of the Secretary's decisions under the Social Security Act. Section 405(g), which is made applicable to the Supplemental Security Income program by virtue of 42 U.S.C. § 1383(c)(3), provides:

(g) Any individual, after any final decision of the Secretary made after a hearing to which he was a party, . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

Section 405(g) does not expressly preclude class relief and, since judicial review is by a civil action, presumably the Federal Rules of Civil Procedure, including Rule 23, apply to that action. In *Salfi*, Justice Rehnquist addressed the class relief problem:

As to class members, however, the complaint is deficient in that it contains no allegations that they have even filed an application with the Secretary, much less that he has rendered any decision, final or otherwise, review of which is sought. The class thus cannot satisfy the requirements for jurisdiction under 42 U.S.C. § 405(g).

422 U.S. at 764, 95 S.Ct. at 2466. In the instant case the class members have filed claims with the Secretary and, although he has not finally passed on each of those claims, he has taken a final position in one of them, Mrs. Carney's case, at the highest administrative level, on a legal issue common to all the class members.

■ In order for a district court properly to entertain an action under § 405(g), two conditions must be satisfied. First, a claim for benefits must have been presented to the Secretary. Second, there must have been a final decision after a hearing. The Supreme Court has held, however, that only the first condition is a mandatory requirement. The second—the requirement that the claimant exhaust his administrative remedies—can be waived either by the Secretary, *Mathews v. Diaz*, 426 U.S. 67, 76, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), or, under certain circumstances, by the court on its own determination, *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

■ The first, non-waivable condition is easily satisfied in this case, with respect to both the individual plaintiffs and the unnamed members of the plaintiff class. In *Mathews v. Eldridge, supra*, the plaintiff contended that due process required an evidentiary hearing prior to the termination of his Social Security disability benefits. The Supreme Court found that the plaintiff had presented his claim to the Secretary in his answers to a state agency questionnaire and in his letters in response to the tentative determination that his disability had ceased. 424 U.S. at 329, 96 S.Ct. 893. The Court distinguished *Salfi* on the ground that there the unnamed plaintiffs' complaints were jurisdictionally deficient since they had not even filed applications with the Secretary. *Id.* at 328, 96 S.Ct. 893. The instant case is controlled by *Eldridge*. With the exception of Liberty Alliance, all the plaintiffs are Supplemental Security Income recipients whose benefits have been reduced or terminated. Moreover, the instant suit was not filed until a year and a half of negotiations between Liberty Alliance and the Social Security Administration over the proper interpretation of § 1611(h) had proven fruitless. This combination of circumstances clearly satisfies the requirement that the claims for benefits be presented to the Secretary.

It was the finality requirement that formed the basis for the District Court's decision below, however. In *Salfi*, Justice Rehnquist, considering the claim of the individual plaintiffs, observed:

Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so

that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefits of its experience and expertise, and to compile a record which is adequate for judicial review. . . . Plainly these purposes have been served once the Secretary has satisfied himself that the only issue is the constitutionality of a statutory requirement, a matter which is beyond his jurisdiction to determine, and that the claim is neither otherwise invalid nor cognizable under a different section of the Act. *Once a benefit applicant has presented his or her claim at a sufficiently high level of review to satisfy the Secretary's needs, further exhaustion would not merely be futile for the applicant, but would also be a commitment of administrative resources unsupported by an administrative or judicial interest.*

422 U.S. at 765–66, 95 S.Ct. at 2467 (emphasis supplied). Justice Rehnquist's reasoning about the inutility of exhausting administrative remedies on a legal issue on which the Secretary has had ample opportunity to take a definitive position, and indeed has done so, applies equally to multiple claimants presenting an identical legal issue. Requiring multiple exhaustion on the same issue would involve the same "commitment of administrative resources unsupported by any administrative or judicial interest" that Justice Rehnquist so aptly condemned in *Salfi.* Resolution of the issue in a single judicial review proceeding conserves both administrative and judicial resources.

 As mentioned earlier, the finality requirement under § 405(g) has been described by the Supreme Court as "waivable." Although we recognize that the determination of administrative finality ordinarily rests with the Secretary, we believe

that the instant case belongs to that category of cases "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Mathews v. Eldridge,* 424 U.S. 319, 330, 96 S.Ct. 893, 900 (1976). In *Eldridge,* Justice Powell, writing for the Court, interpreted § 405(g) to permit a reviewing court, under some circumstances, to make its own judgment as to whether the needs of the administrative process had been satisfied. There the plaintiff's constitutional challenge was collateral to his substantive claim of entitlement. Most importantly, the plaintiff had raised "at least a colorable claim that because of his physical condition and dependency upon the disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments." 424 U.S. at 331, 96 S.Ct. at 901. Like Eldridge, the plaintiffs here are largely dependent upon public assistance payments. An erroneous termination or substantial reduction of this assistance would severely burden their subsistence. Requiring each plaintiff fully to exhaust his administrative remedies, especially where, as here, such exhaustion would be futile, would increase this burden. Moreover, in the exercise of its statutory authority recognized in *Eldridge,* a reviewing court certainly can take into consideration its own interest in preventing multiple judicial review proceedings in cases presenting a legal issue upon which the Secretary has had a full opportunity to make, and has made, an informed, final judgment.[14]

The only facial difference between *Eldridge* and the instant case is that in *Eldridge* the plaintiff's challenge was a constitutional one, while here it is statutory. *Salfi* teaches us that if the legal issue is

---

**14.** The Supreme Court's recent decision in *Mathews v. Diaz,* 426 U.S. 67, 75–76, 96 S.Ct. 1883 (1976), confirms that the only non-waivable requirement of § 405(g) is the claim-filing requirement and that informalities in the method of filing may be disregarded so long as the claim is presented to the agency in a manner which affords it the opportunity to act. In *Diaz* the Court held that the Secretary had waived the exhaustion requirement. In reaching this decision, the Court gave no indication that it was retreating from the *Eldridge* position that in some instances the court could make its own decision as to the appropriateness of further administrative consideration of a legal issue. Indeed, in *Diaz* the Court found a waiver of the exhaustion requirement despite the fact that the Secretary had moved to dismiss the complaint on exhaustion grounds.

constitutional, since the administrative agency cannot decide that issue, no exhaustion is required. 422 U.S. at 765, 95 S.Ct. 2457. Cf. *Johnson v. Robison*, 415 U.S. 361, 366, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Where the legal issue is statutory, however, the agency does have authority to decide it, subject of course to judicial review. The test for exhaustion of a statutory issue in an individual case, we believe, should be whether the Secretary has taken a final position on that issue. In the class context the test should be no different. In the instant case that test has been met. In negotiations with Liberty Alliance, the Department of Health, Education, and Welfare has stated its position that the Secretary's interpretation of § 1611(h) is firm and that this interpretation will not be modified except as dictated by legislative action or by the courts.[15] That firm position has been confirmed in this lawsuit, in which one plaintiff, Mrs. Carney, has fully exhausted all available administrative review. No interest of the agency requires the multiple exhaustion of the same issue by blind class members, who are obviously in strained circumstances and unusually dependent upon the benefits in question. The plaintiffs' interest in prompt resolution of the legal issue is clear. The judiciary's interest in avoiding multiple applications for review is equally clear.

■ Even if this were not a case governed by the *Eldridge* principle, we believe that the Secretary has waived any objections to the failure of the individual plaintiffs and of the class members to exhaust their administrative remedies. In *Mathews v. Diaz*, 426 U.S. 67, 75–77, 96 S.Ct. 1883 (1976), the Supreme Court held that a court can independently determine whether the Secretary has waived the exhaustion requirement, even if the Secretary has moved to dismiss the action on the ground that the plaintiff did not exhaust administrative remedies. In concluding that the Secretary had waived the exhaustion requirement, the

Court in *Diaz* reasoned that there were no facts in dispute, that the Secretary had filed a motion for summary judgment, and that the only issue was a constitutional one. As in *Diaz*, the Secretary here filed a motion for summary judgment, thus suggesting that the case was appropriate for judicial resolution. In addition, although the computation of each claimant's benefits turns on the intricacies of each case, these intricacies are not in dispute here. The only issue in dispute is the proper interpretation of § 1611(h). Finally, for the same reasons as discussed earlier, since the Secretary has taken a final position on the statutory interpretation issue, the fact that the issue here is statutory, while the issue in *Diaz* was constitutional, is not a controlling distinction.

The sensible construction of § 405(g) in *Salfi, Eldridge*, and *Diaz* accommodates the sometimes competing needs of the administrative process for time in which to arrive at a mature judgment on often complex legal issues, of the judicial process for the avoidance of multiple applications for judicial review, and of similarly situated benefit applicants for the avoidance of futile administrative delays in the determination of their benefits. That construction does not preclude, and indeed can accommodate, class relief for identifiable benefits claimants on whose behalf claims have been or will be filed. See *Jimenez v. Weinberger*, 523 F.2d 689 (7th Cir. 1975) (Stevens, Circuit Judge), *cert. denied*, 427 U.S. 916, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (holding that class action relief is available to enforce claims arising under 42 U.S.C. § 405(g) and that such an action tolls the statute of limitations for class members who later file claims).

■ The Secretary argues that despite the common legal issue—the interpretation of § 1611(h)—class relief is nevertheless inappropriate because the mathematical calculation of benefits, even under the Pennsylvania formula, will vary from claimant to claimant. The sterility of that conten-

---

15. *See, e. g.*, Letter of Maurice Newberry, Regional Commissioner, Department of Health, Education, and Welfare (April 14, 1975), *printed in* Appellant's Appendix, at 30.

tion is best illustrated by the relief which the District Court ordered in Mrs. Carney's individual case. The Court did not make the calculation of her benefits. Instead, it afforded judicial review of the Secretary's statutory interpretation and, as § 405(g) expressly provides, remanded for a rehearing at the agency level, where the benefits could be redetermined. Once either interpretation of the statute—the Secretary's or Liberty Alliance's—was accepted, the individual calculations could be made by the agency. The need for such calculations is no reason for barring class relief with respect to the common legal issue which will determine the formula under which these calculations will be made. *See generally* Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. 1281 (1976).

Thus the District Court erred in concluding that § 405(g) proscribed class relief. The issues which the Court should have focused on are (1) whether an identifiable class of claimants had filed with the Secretary claims which presented a common legal issue on which the administrative agency had taken a final position and (2) whether the party seeking judicial review is an adequate representative for that class of blind claimants. In this case Mrs. Carney, at least, would appear to qualify as an adequate class representative. Moreover, there is no immediately apparent reason why § 405(g) should not be interpreted, like § 10 of the Administrative Procedure Act, to permit an organization like Liberty Alliance, whose members are claimants aggrieved by the Secretary's action, to seek judicial review on behalf of those of its members for whom claims have been filed. *See, e. g., Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Liberty Alliance also urges that as an organization it suffered injury in fact from the agency's action by virtue of the loss of credibility it suffered due to its prior advice to its members about the meaning of § 1611(h). We express no view as to whether such an injury would confer standing on Liberty Alliance to seek judicial review within the meaning of § 405(g), since it seems unlikely that in determining the class

action motion the District Court will have to reach the issue. In addition, since a class action determination involves the exercise of discretion in several respects and since authority for its exercise is conferred by Rule 23 on the district court in the first instance, we do not hold that a class action must be entertained. We hold only that the District Court erred in concluding that class relief was proscribed by § 405(g) and that class certification must be reconsidered. But certainly on the record before us no reason appears why such certification should be denied.

### III. CONCLUSION

The order remanding Mrs. Carney's case to the Secretary of Health, Education, and Welfare will be affirmed. The order dismissing the complaint of the remaining plaintiffs and denying the motion for class action certification will be vacated and the case remanded to the District Court for further proceedings consistent with this opinion.