Frances KATZ, Plaintiff,

v.

Patricia Roberts HARRIS, Secretary of
Health and Human Services,
Defendant.

No. 79 Civ. 1995 (WCC).

United States District Court,
S. D. New York.

July 25, 1980.

MFY Legal Services, Inc., New York City, for plaintiff; George S. Locker, New York City, of counsel.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendant; Nancy E. Friedman, Asst. U. S. Atty., Frank V. Smith, III, Regional Atty., Amy Yourman, Asst. Regional Atty., Dept. of Health and Human Services, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

In this action, plaintiff challenges the determinations of the Secretary of the Department of Health and Human Services ("Secretary") that she was not entitled to receive Supplemental Security Income ("SSI") payments during the period October 1975 to September 1977; that by receiving SSI payments during this period plaintiff was overpaid in the amount of such benefits; and that she must repay overpayments made during most of the months prior to April 1977 and in each of the months from April 1977 to September 1977. Review is sought pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).

Background

Plaintiff Frances Katz is a seventy-three-year-old woman who lives on the Lower East Side of Manhattan with her thirty-three-year-old daughter, Natalie Katz. Her daughter suffers from Downs Syndrome and requires constant care, which plaintiff provides.

Both plaintiff and her daughter began receiving SSI as of the program's effective date, January 1, 1974, due to their automatic conversion from the New York State program for Aid to the Aged, Blind and Disabled ("AABD"). 42 U.S.C. §§ 1381–1385 (1970). The Social Security Administration designated plaintiff representative payee for her daughter.

The central issue in this action is whether plaintiff's accumulated savings from October 1975 to September 1977 disentitled her from receiving SSI benefits between those two dates. During that time, plaintiff maintained several bank accounts consisting of funds accumulated entirely from savings of SSI benefits. In addition to savings accounts in her name, plaintiff maintained two fiduciary accounts consisting of savings from her daughter's SSI benefits: between May and August 1976, a trust account totalling approximately $600; and from mid-May 1977 to September 1977, an account in plaintiff's name as. representative payee for her daughter, also totalling approximately $600. In addition, plaintiff owned a pre-paid, pre-need burial contract which was revocable for a refund of $700 for her daughter's benefit.

On August 2, 1976, plaintiff showed her bank books to employees of the Social Security Administration ("SSA"). Although the SSA's notes of that meeting do not reflect plaintiff's total savings on that date, it appears from bank statements which she later submitted that she then had savings of $2,381.40. On August 2, plaintiff signed the following statement:

"The money in the bank is for both me and Natalie which I use for our household expenses and other needs. I will also have the bank account for Natalie corrected to read according to the Social Security requirements.

Statement of Claimant, Administrative Record ("AR") at 97. In a Report of Contact dated August 2 or 4, 1976, the caseworker noted that plaintiff had agreed to submit additional bank statements and that:

"It was also explained to [plaintiff] that she had more than the allowable for an individual in resources when she first became an SSI recipient. Thus the possibility of an [overpayment] exists.

"She was also advised to correct the Bank acct. she has in trust for her daughter, Natalie Katz. The correct procedure was given her to take to the bank. She was informed that if the acct. was not corrected the checks would be suspended until she corrects the acct.

"She agreed to get Bank statement and the correct Bank acct. for Natalie."

At her administrative hearing, plaintiff testified that she had received an instruction sheet from SSA concerning the proper procedures for depositing her daughter's benefits in a savings account and further, that she had submitted that sheet to her bank, pursuant to SSA's instructions.

On August 25, 1976, plaintiff withdrew the existing balance of the trust account to pay a cumulative utilities bill and other household expenses.

In a statement filed with SSA on March 22, 1977, plaintiff claimed resources of $2,496.49; in an April 25, 1977 statement, she indicated that she had resources of $2,436.26.

On April 27, 1977, SSA sent plaintiff a Notice Of Planned Action, informing her of a proposed June 1, 1977 termination of benefits due to her excess resources. Also on April 27, plaintiff established a savings account in her name as representative payee for her daughter. From May to September 1977, plaintiff's savings averaged $1,600 to $2,200.

Administrative Proceedings

The Administrative Law Judge ("ALJ") ruled that plaintiff had been overpaid during the period of April 1976 to September 1977 because during that period her resources from savings were in excess of the amount allowable under SSI regulations.

The ALJ noted that the regulations allow each SSI recipient to retain up to $1,500 in resources, including savings. In this case, however, he allowed plaintiff $3,000 in resources between December 1975 and April 1977:

"It would seem to be equitable to apply the figure of $3,000 as the resources limit for both the claimant and her daughter, Natalie, prior to April, 1977, when the claimant established an account for the claimant as representative payee for Natalie. From April, 1977 to October, 1977 the $1500 limit would apply to the claimant. The $3000 limit is being applied prior to April, 1977 because from December, 1975 to April, 1977 there was a commingling of the Supplemental Security Income payments received by the claimant and Natalie, so it would be next to impossible to tell what part of these commingled funds belonged to which recipient of Supplemental Security Income."

The regulations make no provision for treating a mother and daughter as a "savings unit" in this manner but the ALJ believed that in this case plaintiff's close relationship with her daughter dictated this result. The ALJ stated that:

"While it is true that we have been concerned only with the claim of Frances Katz, this claim cannot be considered in complete isolation because of the relationship between the claimant and her disabled daughter, Natalie Katz, who is also a Supplemental Security Income recipient, with her mother, Frances Katz, acting as her representative payee. Natalie Katz accompanied her mother to the hearing, and sat on the floor, refusing a chair. Although she did not speak during the entire hearing, it was apparent that the daughter, Natalie, is severely retarded. Natalie has required constant care by her mother since she was born. So when one considers the claimant's age, her limited education, and years of doing little more than taking care of her disabled daughter, it is understandable why the claimant was lumping together her Supplemental Security Income and the Supplemental Security Income received by her on behalf of Natalie, because the claimant had to pay all the bills for both of them, with any excess being deposited in one of the bank accounts.

\*     \*     \*     \*     \*     \*

"It appears from the summary of accounts (Exhibit No. 53) that the total of the savings accounts exceeded $3,000 every month for the period April—August, 1976 and for the period January, February, and March, 1977. The total of the claimant's savings accounts exceeded $1500 for each month during the period April—September, 1977. For the eight months' period when the $3000 limit applied, the claimant was overpaid $1839.20 (8 × 229.90) and during the 6 months' period when the $1500 limit applied to only the total of the claimant's accounts, the claimant was overpaid $1379.40, making a total overpayment of $3218.60."

The ALJ found that plaintiff was not without fault as to the overpayment of $3,218.60, in that she knew, or should have known, "what her responsibilities were with reference to the requirement that she report to the Social Security Administration when her resources exceeded the applicable amount." The ALJ stated that:

"However, the evidence indicates that numerous conferences were held between the personnel at the local district office of the Social Security Administration and the claimant, during which it was explained to the claimant just what her responsibilities were in her individual case, and as representative payee for her daughter, Natalie. This evidence of conferences and the coherent, relevant testimony given by the claimant during the hearing creates a presumption that the claimant was able to comprehend the necessity of reporting resources in excess of the allowable amounts. So it appears that the claimant cannot be found to be without fault in causing the overpayment in her case."

The ALJ noted in the alternative that: "even if the claimant were to be found not at fault in causing the overpayment, this overpayment can be recovered from the claimant by deducting a reasonable amount from her monthly Supplemental Security Income without such regular deductions depleting her income and resources to such a low level as to prevent her from meeting her ordinary and necessary living expenses."

Thus, in addition to finding that claimant was not without fault in creating the overpayment, and therefore, that recovery of such overpayment could not be waived, the ALJ also ruled that recovery of the overpayment would not defeat the purposes of Title XVI of the Social Security Act, or impede its efficient and effective administration, nor be against equity and good conscience.

Overpayment

The basic eligibility requirements for SSI recipients are set forth in Section 1611 of the Social Security Act, as amended, 42 U.S.C. § 1382(a). An eligible individual may have no more than $1,500 in resources, other than "resources excluded pursuant to Section 1382(b) . . .," which exclusion is irrelevant to savings. Plaintiff was converted to the SSI program from the New York State AABD plan, however, and the SSI program provides that such converted recipient's resources shall be "deemed" not to exceed the $1,500 SSI maximum set in Section 1382(a) if such resources do not exceed the maximum allowed by the state plan under which they received benefits in December 1973. See § 1382(g) and 20 C.F.R. § 416.1260. However, the state plan referred to in Section 1382(g) must have been an approved plan within the meaning of Titles I, X, XIV, or XVI of the Social Security Act as in effect in December of 1973, and of Title 45 C.F.R. Chapter II as in effect in October 1972. 20 C.F.R. § 416.1260. Secondly, a recipient must have been receiving state AABD benefits correctly under such an approved plan. 20 C.F.R. § 416.121(a).

Plaintiff claims that the ALJ erroneously found her eligible for SSI benefits only in those months in which her savings did not exceed $1,500 (or $3,000 prior to April 1977). Plaintiff urges the Court to apply a $2,000 (or $4,000, prior to April 1977) resource exclusion, to which plaintiff claims she is entitled due to her "conversion" to the SSI program from the New York AABD plan. Plaintiff contends that the New York AABD plan was an "approved" plan that allowed recipients to retain up to $2,000 in

savings without affecting their eligibility for benefits, and that she was "correctly" receiving benefits under this plan in December 1973.

In short, plaintiff argues that under the "grandfathering" provisions of the Social Security Act, specifically § 1611(g), she is entitled to utilize what she contends is the more favorable resource exclusion of the state plan for the purpose of determining her financial eligibility for SSI payments. Since the ALJ failed to do this, plaintiff urges the Court to reverse the Secretary's decision, and recompute her overpayment based on the state resource exclusion. See 42 U.S.C. § 1383(c)(3); *Rivera v. Harris*, 623 F.2d 212 (2d Cir. 1980) (where an ALJ has failed to evaluate evidence properly because of an erroneous view of the law, the Secretary's decision will not be upheld). In addition, plaintiff claims that she and her daughter should be treated as a savings unit throughout the period in which overpayment is sought, and accordingly, a $4,000 resource exclusion should be applied to their savings.

Defendant concedes that the New York AABD plan was an "approved" plan, and does not contest plaintiff's claim that she was "correctly" receiving benefits under it in December 1973. Defendant claims, however, that plaintiff has misconstrued the provisions of the state plan, and that the New York AABD rule, contrary to plaintiff's contention, was that recipients could retain merely $500 *or* $2,000 in state welfare benefits. The Secretary claims that plaintiff's SSI benefits are subject to the $500 exclusion, rather than the $2,000 exclusion for *state* welfare benefits, and thus, that plaintiff's "grandfathered" status as a "converted" recipient is irrelevant to the determination of her financial eligibility, in that the resource provisions of the state plan were, in fact, less advantageous than the $1,500 resource exclusion normally accorded SSI recipients.

The "grandfathering" statute relevant in this case is subsection (g) of Section 1611 of the Social Security Act, as amended in Pub.L. No. 92–603 (1973):

"Certain Individuals Deemed to Meet Resources Test

(g) In the case of any individual or any individual and his spouse (as the case may be) who for the month of December 1973 was a recipient of aid or assistance under a State plan approved under title I, X, XIV, or XVI, the resources of such individual or such individual and his spouse shall be deemed not to exceed the amount specified in sections 1611(a)(1)(B) and 1611(a)(2)(B) during any period that the resources of such individual or individual and his spouse (as the case may be) does not exceed the maximum amount of resources, as specified in the State plan (above referred to, and as in effect in October 1972) under which he or they were entitled to aid or assistance for the month of December 1972."

In applying the statute to this case, the critical determinant is the maximum amount of New York AABD benefits that plaintiff could retain. The Secretary relies on the Claims Manual of the Social Security Administration, which states at Section 12677(b) that New York allowed state welfare recipients to retain $500, or "$2,000 in state welfare benefits accumulated prior to 1974." The Claims Manual purports to be compiled from the state plan itself, Section 12677(a), but the Secretary admits that the state plan had no such provision in written form. In fact, the Secretary states that it appears from the written provisions of the plan that the New York AABD allowed recipients to retain no savings, with the exception of $500 reserved for a burial fund.

The Secretary has provided the Court, however, with letters written between state officials which indicate, at least as of February 8, 1968, that AABD recipients were allowed additional savings. On that date, in a letter to Commissioner Goldberg, New York City Department of Social Services, Joseph Louchheim, Deputy Commissioner of the New York State Department of Social Services, set out a new policy with respect to all welfare recipients:

"A recipient of public assistance may choose to make a reasonable plan for the purchase of items on which need is determined, since as you know, public assistance payments should not be restricted. The recipient may choose to set aside in a bank, in a credit union or keep at home the amount planned for meeting specific needs. We seriously doubt that any such assistance savings for these purchases would ever become great enough to affect the current liquid assets provision."

In her brief, the Secretary notes that New York had no "liquid assets provision," and concludes, therefore, that Mr. Louchheim's letter was referring to the federal liquid assets provision of $2,000, now stated at 45 C.F.R. 233.20(a)(3). The Secretary claims that the change in state policy that is marked by this letter, allowing recipients to save up to $2,000 from their assistance grant, had no counterpart with respect to recipients' savings from other sources, and that such savings continued to be prohibited through the conversion into the SSI program in 1974, with the exception of the $500 burial fund.

The Secretary notes, however, that Mr. Louchheim refers to "assistance savings," whereas it is the Secretary's position that the New York plan applied the $2,000 exclusion solely to savings from "state welfare benefits." The Secretary asks the Court to construe "assistance savings" as limited to savings from state welfare benefits, and not to include savings from SSI benefits. The Secretary states that policy considerations favor a policy of strict construction where the recipient is urging the Court to adopt a heretofore unrecognized "grandfathered" right and the relevant state plan provisions are unclear:

"The purpose of the 'grandfather' provisions of Section 1611(g) of the Act (42 U.S.C. § 1382(g)) was that individuals receiving AABD under state plans containing less stringent eligibility requirements than the SSI program should not become ineligible simply by virtue of their conversion to SSI. The policy favoring conversion of state plan recipients to the federal plan, however, was outweighed by the independent policy that once a recipient is in the federal program, wherever possible, uniformity of treatment (i. e., equal savings limits) as to SSI beneficiaries should be observed."

The Secretary does not refer the Court to any legislative history which bolsters this interpretation, however.

Our own research has disclosed support for the Secretary's claim that the purpose of Section 1611(g) was to protect the eligibility of individuals "converted" to the federal program from state plans with more favorable resource provisions.[1] However, we have not found any language in the legislative history to support the Secretary's second claim, of an "independent policy that once a recipient is in the federal program . . ., uniformity of treatment . . . should be observed." The Secretary has elsewhere conceded that Section 1611(g) adopted a non-uniform standard for grandfather resource disregards, see *Liberty Alliance of the Blind v. Califano*, 568 F.2d 333, 343 (3d Cir. 1977), and the statute provides for on-going special treatment for converted recipients "during any period" that their resources do not exceed the maximum allowed by the state plan.

In addition, the Court rejects the Secretary's contention that we should strictly

---

1. Section 1611(g) originated in a floor amendment proposed by Senator Cranston, who stated in support that:

"This amendment is of a basically noncontroversial nature, and would simply 'grandfather' in present disability and resources for those receiving aid to the blind, aged and disabled. This encompasses approximately 1,500 individuals whose resources are presently within the allowable resources in their respective states, but would be over the maximum resource 'disregard' in [the new act].

118 Cong.Rec.S. 17,029 (daily ed., October 5, 1972)."

Although this statement suggests that the statute was limited to state recipients whose resources were in excess of SSI requirements at the time of the January 1974 conversion, the Secretary concedes that assuming that the grandfathered resource disregard applies to SSI benefits, "[t]he amount of savings at the time of conversion is irrelevant," citing 42 U.S.C. § 1382(g). Defendant's Memorandum in Response to the Court's Inquiries, at 6.

construe the reference to "assistance savings" in Mr. Louchheim's letter, so as to exclude SSI benefits. Strict construction is not appropriate in this case, given that plaintiff's claim to the $2,000 resource disregard arises under Section 1611(g) of the Social Security Act.

> "The congressional policy underlying the federal social security legislation requires the courts to interpret the act liberally, and any doubts as to coverage should be resolved in favor of coverage."

*Herbst v. Finch*, 473 F.2d 771, 775 (2d Cir. 1972).

In fact, there is little room for construction in this case, for the plain meaning of "assistance savings" includes savings from SSI benefits. The Secretary's claim that SSI benefits would not be accorded the $2,000 limit is at best a technical distinction, premised on the identity of the assistance provider rather than on any valid policy considerations.[2] Moreover, the Secretary's contention would render plaintiff ineligible simply because she receives her benefits from the federal government, a result directly contrary to the intent of Section 1611 that the Secretary concedes was to ensure that state plan recipients converted to the SSI program should not become ineligible simply by virtue of their conversion.

■ The Court therefore concludes that the disregard for assistance savings is applicable to plaintiff's SSI savings,[3] and she was entitled to the benefit of this exclusion in the determination of her financial eligibility. This Court concurs with a similar finding by Judge Sand in *Yulling v. Califano*, 474 F.Supp. 601, 606 (S.D.N.Y.1979), that the New York AABD plan allowed

recipients to accumulate up to $2,000 in savings from assistance.

However, defendant also argues that the New York plan had an additional constraint on permitted savings: savings were permitted only for identified "special needs." In support of this contention the Secretary refers to Mr. Louchheim's letter, wherein he states that:

> "A recipient of public assistance may choose to make a reasonable plan for the purchase of items on which need is determined . . . The recipient may . . keep at home the amount planned for meeting specific needs."

Plaintiff does not contest this requirement; rather, she claims that the record demonstrates that her savings were retained to meet identified specific needs, namely, medical care and transportation, which are delineated as specific, allowable needs under 18 N.Y.C.R.R. § 352.1.

■ The Court finds that the New York AABD plan did require that savings be retained for specific identified needs, for the purchase of items on which need was determined by the AABD plan. The Court finds, however, that the issue of plaintiff's compliance with this requirement cannot be determined on the present record, in that this issue was not addressed at plaintiff's hearing, and, consequently, she was not informed that the reason for her savings was in issue.

Accordingly, this matter must be remanded to the Secretary for further proceedings respecting the New York AABD plan requirements. Though this matter is remanded, the Court deems it appropriate to note that restrictions on a recipient's use of his

---

**2.** In fact, the policy that led the New York plan to allow assistance recipients to save from their grants was the federal "money payment" principle. Letter of Louis Bennett, Defendant's Memorandum in Response to the Court's Inquiries. A similar principle is found in the SSI regulations. 20 C.F.R. § 416.110(c); *Yulling v. Califano*, 474 F.Supp. 601, 606 (S.D.N.Y.1979).

**3.** Thus, the Court does not reach the issue of defendant's claim that the New York AABD plan applied a $500 resource disregard for savings not derived from the assistance grant.

The Court notes, however, that such a provision might bring the state plan into conflict with the federal policy of equal treatment of income stated in 45 C.F.R. § 233.20(a)(3). Moreover, the Secretary's contention contradicts the finding in *Yulling, supra*, that New York State officials understood that there existed an applicable "liquid assets provision" for retained assets, of $2,000, rather than a " 'zero' level of permitted 'resources' " for savings other than from benefits (with the exception of the $500 burial allowance).

assistance grant are strongly disfavored by federal policy. Title 45 C.F.R. § 234.11(a) provides that:

"Money payments are payments in cash, checks, or warrants immediately redeemable, made to the grantee or his legal representative *with no restriction imposed by the agency on the use of funds by the individual.*" (1971) (emphasis supplied).

The rationale for this provision is explicitly stated in the Federal Handbook of Public Assistance Administration:

"The provision that assistance shall be in the form of money payments is one of several provisions in the act designed to carry out the basic principle that assistance comes to needy persons as a right. The right carries with it the individual's freedom to manage his own affairs; to decide what use of his assistance check will best serve his interests; and to make his purchases through normal channels of exchange, enjoying the same rights and discharging the same responsibilities as do friends, neighbors, and other members of the community. The Social Security Administration's interpretation of 'money payments' recognizes that a recipient of assistance does not, because he is in need, lose his capacity to select how, when and whether each of his needs is to be met." Part IV, § 5120

State compliance with these policies was a condition to federal financial supplementation of state programs, including the New York AABD plan. Although Title 45 C.F.R. § 233.20(a)(3) allows state plans to require that savings of assistance recipients are "retained to meet current and future needs," it is clear in light of the "money payment"

principle that the "current and future needs" provision is not a broad license for the state to impose substantial restrictions on the recipient's decision to save from the grant.

■ Accordingly, the Court concludes that the "specific needs" requirement must be applied by the Secretary with the least possible intrusion on the "converted" recipient's determination to save from his grant. A written statement signed by the "converted" recipient, certifying that his savings in excess of the normal $1,500 SSI disregard are retained to meet specific needs, and for the purchase of items on which need is determined, would be appropriate.[4] Both parties agree that 18 N.Y.C. R.R. § 352.1, as in effect in October 1972, sets out the pertinent items, including food, clothing, etc., and such non-recurring items as stoves and extraordinary shelter costs. Plaintiff should be allowed the opportunity to certify, retroactively, that her savings met these requirements. The Secretary might also consider whether the New York plan recognized special needs, such as those of plaintiff's afflicted daughter.

Should the Secretary determine that plaintiff and her daughter were each entitled to the full $2,000 exclusion, the same equitable considerations that led the ALJ to treat plaintiff and her daughter as a savings unit until April 1977, and thus utilize a $3,000 resource exclusion, would warrant the conclusion that plaintiff and her daughter were entitled to a $4,000 resource disregard through this period, provided that their savings met the above discussed "specific needs" requirement. Application of the full $4,000 limit eliminates the overpay-

---

**4.** In her brief in *Yulling, supra,* the Secretary indicated that the current operating policy of the SSA was to require "converted" recipients to sign a written statement certifying that their savings met the "specific needs" requirement of the state AABD plan. Defendant's Supplemental Memorandum, at 11.

In her brief, the Secretary stated that:

"If the $2,000 limit applied to savings regardless of the source of savings, and specific need had to be shown for any savings then, after conversion, plaintiff could retain up to $1,500 without any showing of need, and

would be required to show specific need only as to any savings in excess of that amount up to $2,000."

Memorandum in Response to the Court's Inquiries, at 12. This policy is equally applicable to the Court's holding that the $2,000 limit applies to savings from SSI benefits, and thus it appears that plaintiff is obligated to satisfy the specific need requirement only with respect to her savings in excess of $1,500 (or $3,000 for plaintiff and her daughter, in the period within which the joint resource disregard is applicable).

ment from October 1975 to April 1977, for the combined resources of plaintiff and her daughter never exceeded $4,000 during this period.

■ However, the ALJ found that the joint resource disregard was inapplicable beginning in April 1977. Plaintiff concedes the existence of an overpayment during this period if the Court adopts the Secretary's findings and imposes a complete separation of plaintiff's funds from her daughter's as of April 1977. However, it is plaintiff's position that the savings of herself and her daughter should be aggregated throughout the period in which repayment is sought.

Both parties, in discussing the ALJ's use of April 1977 as a cut-off for the joint resource disregard, treat the question as one of fault. The Social Security Act provides that "whenever the Secretary finds that more . . . than the correct amount of payment has been made to any . . . person . . . the Secretary shall . . . require such over-paid person . . . to refund the amount in excess of the correct amount . . . ." 42 U.S.C. § 404(a). However, "there shall be no recovery by the United States from any person who is without fault if such . . . recovery would defeat the purpose of [Title II of the Act] or would be against equity and good conscience." 42 U.S.C. § 404(b).

By regulation, the Secretary has set out criteria which will be applied in determining whether an individual was "without fault" in accepting benefits. "[A]ll pertinent circumstances, including age, intelligence, education, and physical and mental condition" are to be considered, 20 C.F.R § 404.507, as well as the recipient's good faith. *Califano v. Yamanski*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Fault may be found if overpayment resulted from one of three causes:

"(a) Failure to furnish information which the individual knew or should have known was material;

"(b) An incorrect statement made by an individual which he knew or should have known was incorrect;

"(c) The individual did not return a payment which he knew or should have been expected to know was incorrect." 20 C.F.R. § 416.552

The ALJ did not make an explicit finding of fault premised on any of these categories in his decision not to aggregate the resources of plaintiff and her daughter as of April 1977. In her brief, the Secretary states that there is substantial evidence in the record to support the April 1977 policy as a category (c) situation. The Secretary claims that as of April 1977, plaintiff understood that a single resource disregard would apply to savings in her personal account, and that by continuing to retain savings in her personal account in excess of the allowable amount, plaintiff knew or should have known that she was ineligible for subsequent SSI benefits, and that payment of such benefits was incorrect.

It is necessary to review two of the Secretary's regulations to understand how plaintiff could have understood that savings in her personal account would be accorded a single resource disregard, irrespective of whether these savings were derived from her daughter's SSI benefits and were reserved for her daughter's needs. The proper banking procedures for a representative payee are set out in 20 C.F.R. § 404.1605:

"Surplus funds deposited in an interest or dividend bearing account . . . must be kept in a form of account which clearly shows that representative payee has only a fiduciary, and not a personal interest in the funds."

By keeping the savings of her daughter in plaintiff's personal account, plaintiff retained the "right, authority or power to liquidate" her savings accounts, and thus, such savings must be considered as entirely plaintiff's resources. 20 C.F.R. § 416.1207. Technically, plaintiff's savings were subject to a single resource disregard in the period in which the ALJ applied a joint exclusion, but equitable considerations led the ALJ to treat plaintiff and her daughter as a savings unit, as long as it was reasonable to assume that plaintiff did not understand her obligations, and was therefore "without fault."

The issue for the Court to determine is whether there is support in the record for a finding of fault, *i. e.*, that plaintiff knew of her responsibility to keep separate accounts as of April 1977, and knew that subsequent SSI payments were incorrect due to her excessive resources. The Secretary's findings are conclusive if supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), that is, " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Richardson, supra*, 402 U.S. at 401, 91 S.Ct. at 1427, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

The Court finds substantial evidence for the Secretary's finding of fault, based on plaintiff's creation of the representative payee account. Plaintiff's establishment of this account was an adequate basis for the Secretary's conclusion that plaintiff understood that she could not properly commingle her savings with those of her daughter's. Plaintiff argues that the ease with which she could have kept her account within allowable limits, by siphoning off the excess into her daughter's account, indicates that her failure to do so was out of ignorance of the Secretary's requirement that she and her daughter keep separate accounts. However, although the ALJ might have concluded that her failure to keep separate accounts was conclusive proof of her ignorance of the regulations, he might also have reasonably found that reasons other than ignorance led to her noncompliance, reasons such as the inconvenience occasioned by having to transfer funds and perhaps close some of plaintiff's several accounts. The standard of review is not which is the most plausible hypothesis, for even though another trier-of-fact might reach a different conclusion if he were weighing the evidence *de novo*, the Secretary's choice may not be displaced where it is supported by substantial evidence. *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978).

The ALJ applied a single resource disregard as of April 1, 1977, even though plaintiff did not establish the representative payee account until April 27, 1977. The issue whether the April 1, 1977 cut-off is justified is particularly significant, in that April 1 is the "first moment" in the second quarter of the benefit year. Plaintiff's eligibility is assessed quarterly, and if her resources are not in excess of the allowable amount as of April 1, then her financial eligibility is established throughout the quarter, irrespective of her resources until the "first moment" of the next quarter. 20 C.F.R. § 416.1324(a)(3). Thus, if plaintiff was entitled to the $4,000 disregard as of April 1, 1977, there was no overpayment in May and June of 1977 as well.

The Secretary claims that prior to April 1, 1977, plaintiff was informed of her responsibility to keep her and her daughter's accounts separate, through "numerous conferences" with the Social Security Administration. Review of the records of these conferences, however, does not present substantial evidence for the conclusion that plaintiff knew or should have known at that time that she could not properly commingle her savings with her daughter's savings. The Secretary relies on the meeting of August 2, 1976, at which time plaintiff first showed her bankbooks to caseworkers of the Social Security Administration. One caseworker completed a "Report of Contact" after the meeting, which states that:

" * * * it was also explained to her that she had more than the allowable for an individual in resources when she first became an SSI recipient. Thus the possibility of an [overpayment] exists.

"She was also advised to correct the Bank acct. she has in trust for her daughter, Natalie Katz. The correct procedure was given to her to take to the Bank. She was informed that if the acct. was not corrected the checks would be suspended until she corrects the acct." Tr. 100.

It is not clear from this Report how plaintiff could possibly have understood how she was out of compliance with SSA requirements. The phrase "she had more than the allowable for an individual in resources when she first became an SSI recipient" is particularly confused, and confusing, in

light of the fact that none of the bankbooks that plaintiff submitted record savings within a year of the time plaintiff first became an SSI recipient, in January of 1974. The Report does not refer to the separate account requirement, or even to plaintiff's role as a representative payee, and there is a suggestion that the proper procedures to correct plaintiff's trust account were given to plaintiff in an instruction for her bank, rather than explained to her. Significantly, the Report does not state that plaintiff was informed that her savings must be kept separately from her daughter's, so that each would have a $1,500 exclusion.

Plaintiff's statement at this meeting gives some indication of her understanding of the SSI requirements. She certified that:

"The money in the bank is for both me and Natalie, which I use for our household expenses and other needs.

"I will also have the bank account for Natalie corrected to read according to Social Security requirements."

If plaintiff was informed at the August 2, 1976 meeting that there was no justification for commingling her daughter's savings with plaintiff's savings, this statement is no indication of it.

Accordingly, the Court reverses the decision of the Secretary that a single resource disregard should apply from April 1, 1977. Thus, plaintiff retained her financial eligibility for SSI benefits for the payment quarter beginning April 1, 1977. The Court also reverses the Secretary's decision that the pre-need pre-paid burial contract which plaintiff contracted in her daughter's name on March 24, 1977 should be computed as one of plaintiff's countable resources. Plaintiff's receipt for the contract is clearly marked "for Natalie Katz"; the other contracting party, the United Hebrew Community, kept the contract as a "Deposit and Security Account" solely in the name of Natalie Katz. The ALJ based his decision on the fact that the contract was revocable by plaintiff, with the cash surrender value going to her. This is equally true for representative payee accounts, however, and thus, the meaningful fact in light of the

Secretary's regulations is that plaintiff kept the contract in her daughter's name, with no indication that she retained a personal interest. See 20 C.F.R. 404.1605.

Without the inclusion of the $700 surrender value of the contract, plaintiff's resources never exceed $2,000 for the last quarter of the period in which the Secretary found an overpayment.

Summary

Plaintiff is entitled to utilize the $2,000 resource exclusion from October 1975 to September 1977, provided that she has complied with the requirements of the New York AABD plan. The issues of whether plaintiff's savings were accumulated to meet "specific needs," and whether plaintiff was "correctly" receiving AABD benefits in December 1973, are remanded to the Secretary for further proceedings.

Plaintiff will not be penalized for commingling her resources with her daughter's savings, with a total $4,000 resource disregard, from October 1975 to April 27, 1977. The issue of plaintiff's daughter's compliance with the "specific needs" requirement of the AABD plan, as well as whether she was receiving AABD benefits "correctly," is also remanded to the Secretary.

■ Plaintiff's resources for the quarter beginning in July 1977 do not include the surrender value of the burial policy which plaintiff purchased for her daughter. During this quarter, and throughout the period in which the Secretary found an overpayment, plaintiff's resources were not in excess of the resource disregard for "converted" recipients of SSI. Thus, the Court holds that plaintiff retained her financial eligibility throughout the period in question, provided that she satisfies the "specific needs" requirement of the AABD plan.

Accordingly, the action is remanded to the Secretary for further proceedings not inconsistent with this Opinion and Order and is placed on the Suspense docket of this Court.

SO ORDERED.